IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

TYLER DOUGLAS HINDS,        )     CASE NO.  1:18-cv-01478
                        )
            Plaintiff,     )     MAGISTRATE JUDGE
                        )     KATHLEEN B. BURKE
          v.           )
                        )
COMMISSIONER OF SOCIAL     )
SECURITY,                )
                        )     **MEMORANDUM OPINION & ORDER**
          Defendant.   )

Plaintiff Tyler Douglas Hinds ("Plaintiff" or "Hinds") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 14.  For the reasons explained herein, the Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

On November 13, 2014, Hinds protectively filed[1] an application for supplemental security income ("SSI").  Tr. 17, 118, 201-206.  Hinds alleged disability beginning on August 8, 2014.  Tr. 17, 101, 253.  He alleged disability due to depression, myotopic dystrophy, ADD, bi-polar disorder, learning disorder, and low IQ.  Tr. 101-102, 142, 152, 258.  After initial denial by the state agency (Tr. 142-148) and denial upon reconsideration (Tr. 152-156), Hinds requested a

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 8/5/2019).

hearing (Tr. 159-161). On May 23, 2017, a hearing was held before an Administrative Law Judge ("ALJ"). Tr. 35-74. On October 17, 2017, the ALJ issued an unfavorable decision, (Tr. 14-34), finding that Hinds had not been under a disability, as defined in the Social Security Act, since November 13, 2014, the date the application was filed (Tr. 18, 28).[2] Hinds requested review of the ALJ's decision by the Appeals Council. Tr. 196-198. On April 27, 2018, the Appeals Council denied Hinds' request for review, making the ALJ's October 17, 2017, decision the final decision of the Commissioner. Tr. 1-6.

## II. Evidence

### A.    Personal, vocational and educational evidence

Hinds was born in 1990. Tr. 27. At the time of the hearing, Hinds lived with his girlfriend in a house that his parents purchased for him. Tr. 44-45. His girlfriend was staying with him since she had moved out of one apartment and was waiting to move into a new apartment. Tr. 44-45. Hinds attended school through the twelfth grade and attended a technical college where he learned about auto-related technical skills. Tr. 42. Hinds was dismissed from the technical college in March 2010. Tr. 42, 424, 425. Hinds relayed that he had been suspended from the technical school due to the college feeling he was unable to learn. Tr. 42. A letter from Mr. Davis, department head at the technical college, noted that Hinds faced academic challenges and there were also issues of safety due to Hinds' difficulty in working with and handling equipment. Tr. 424. Hinds last worked in the summer of 2014 at Wal-Mart. Tr. 43, 679. Hinds had received assistance through the Ohio Bureau of Vocational Rehabilitation

---

[2] In his decision, the ALJ noted that Hinds had filed a prior application for SSI benefits in 2010 and that application was denied in a decision dated April 5, 2013, and, on August 11, 2014, the Appeals Council denied review of that decision. Tr. 17-18. The ALJ found that Hinds' current claim involved deciding whether Hinds was disabled during a period not adjudicated by the prior final decision on the prior claim and the ALJ found that there was new and additional evidence that provided a basis for a different residual functional capacity. Tr. 18. Hinds does not raise an issue regarding this finding.

("BVR"). Tr. 316-421, 679. BVR closed Hinds' case on April 16, 2015, for the following reasons "Refused Services or No Further Services. Based on our discussion today, you have a desire to stabilize your health and explore Social Security, prior to considering working." Tr. 317.

## B. Medical evidence

### 1. Treatment history

*Physical Impairments*

On April 10, 2014, Hinds saw Michael W. Walker, M.D., an orthopedic physician at the Cleveland Clinic, for an opinion regarding cramping and spasms that Hinds was having in his hands and wrists. Tr. 560-561. Hinds' mother attended the appointment with him. Tr. 560. Hinds relayed that he was being treated for bipolar disorder and attention deficit disorder and he had been having the reported wrist and hand problems prior to being placed on medications for his psychiatric disorders. Tr. 560. Hinds denied pain, paresthesias, weakness, numbness or tingling. Tr. 560-561. The cramping and spasms occurred when Hinds tried to use his hands for manipulative activity, e.g., trying to open a jar. Tr. 561. During such activity, Hinds indicated his fingers and wrists cramped up. Tr. 561. Hinds denied any other joint involvement or neck pain or neck trauma. Tr. 561. Hand x-rays showed no significant abnormalities involving the fingers or carpal bones. Tr. 561. During a physical examination, Dr. Walker observed that Hinds had some difficulty unbuttoning the sleeve on his shirt and he seemed to have lost some dexterity in his hands. Tr. 561. There was no swelling with regard to range of motion of Hinds' fingers, thumb, wrist or elbows and there was no triggering of the flexor tendons. Tr. 561. Dr. Walker diagnosed spasticity of the hands bilaterally. Tr. 561. Dr. Walker did not see any

obvious orthopedic issues to explain Hinds' issues and recommended a neurological consultation. Tr. 561.

On May 8, 2014, Hinds saw neurologist Sheila Rubin, M.D., at the Cleveland Clinic for a consultation regarding his hands locking up. Tr. 559-560. Hinds relayed that he had had problems with his hands locking up his entire life. Tr. 559. The problems had not gotten worse but his father noticed the problem and suggested that Hinds have the problem looked at. Tr. 559. Hinds explained that his hands "ball up" when using them to cook or grip something tightly; he was unable to do pull ups; he shook his hands to unlock them; his symptoms were not painful; he did not have problems while eating, shaving or writing; and cold weather made his symptoms much worse. Tr. 559. Hinds indicated that he slept well and his energy level was "terrific." Tr. 559. Hinds reported always having a "speech impediment." Tr. 559. He denied shortness of breath, chest pain, fever/chills, headaches, neck and back pain, or memory problems. Tr. 559. Dr. Rubin's impression was probable myotonic dystrophy type I, noting that Hinds exhibited temporal balding, facial weakness, slurred speech, and myotonia. Tr. 560. Dr. Rubin ordered an EMG/NCV, EKG and cardiology and ophthalmology consults. Tr. 560. Dr. Rubin noted that she was unable to order genetic testing; Hinds would need to be referred to a genetics counselor for such testing. Tr. 560.

On May 15, 2014, Hinds saw Abdul R. Wattar, M.D., F.A.C.C., a cardiologist at the Cleveland Clinic, to rule out myotonic dystrophy associated cardiac abnormality. Tr. 556-559. Dr. Wattar ordered a cardiac MRI. Tr. 558. Hinds denied any current active cardiac symptoms. Tr. 558. Dr. Wattar's physical examination findings were unremarkable. Tr. 557-558. Hinds' cardiac MRI was performed on May 29, 2014. Tr. 562, 564-569. Hinds saw Dr. Wattar on June 12, 2014, for follow up. Tr. 552-555. Dr. Wattar reviewed the cardiac MRI test results,

indicating that the MRI showed that the left ventricle was normal in size, shape, and low normal function, EF 54%; there were prominent trabeculations along the distal apical walls and significant thinning of the mid-distal lateral walls of the left ventricle, measuring 4-5 mm; there were no segmental wall motion abnormalities; there were no findings to suggest prior ischemic damage or an infiltrative process; and there was normal aortic, mitral and tricuspid valve function. Tr. 554. Hinds denied any current active cardiac symptoms but noted occasional shortness of breath. Tr. 554. Dr. Wattar offered to have a chest x-ray performed but Hinds' mother declined and indicated that Hinds would follow up with his primary care physician. Tr. 555. Dr. Wattar advised Hinds to stop smoking. Tr. 555.

On December 4, 2014, Hinds saw Kristen A. Smith, M.D., at Associates in Neurology, Inc. with complaints of his hands locking up on him for several years. Tr. 609-610. Hinds noted that he had been seeing Dr. Rubin but she did not take his insurance. Tr. 609. Hinds' mother accompanied him to the appointment. Tr. 609. They relayed that Hinds had been seen at the Cleveland Clinic and had been diagnosed with possible myotonic dystrophy. Tr. 609. Hinds indicated that if he balled his hands into fists they stayed that way. Tr. 609. Also, he indicated that his mouth stayed open like a fish. Tr. 609. Hinds' mother relayed that Hinds had breathing problems as a baby; he had learning disabilities; his speech was unclear; and he did not notice myotonic features in his feet or larger muscle groups. Tr. 609. Hinds' mother indicated that Hinds was looking for a job and she felt that he should be employable. Tr. 609. On physical examination, Dr. Smith observed that Hinds had "the typical gaping mouth and narrow face," his speech was slightly slurred; he exhibited involuntary movements, i.e., tonic maintenance following muscle tension was observed, especially in the hands and bilateral upper extremities; there were no tremors; muscle atrophy was noted throughout; and diffuse weakness with tonic

maintenance of effort was observed. Tr. 609-610. Dr. Smith ordered EMG testing of the extremities and indicated that she would see Hinds for follow up after the testing was completed. Tr. 609.

EMG testing of the right upper and lower extremities was completed on January 10, 2015. Tr. 611-613. The testing showed evidence consistent with myotonic dystrophy type I. Tr. 613. Also, it was noted that there may be superimposed mild median mononeuropathy at the wrist, i.e., carpal tunnel syndrome. Tr. 613, 614.

Hinds saw Dr. Smith on February 12, 2015, for follow up regarding his myotonic dystrophy and for review of the EMG. Tr. 615-616. Hinds reported problems with heartburn and that he occasionally noticed skipped heartbeats. Tr. 615. Hinds' mother reported that Hinds' IQ was measured at 79. Tr. 615. During a physical examination, Dr. Smith observed that Hinds was alert and in no acute distress; he exhibited the typical gaping mouth and narrow face; he had mild impairment of cognitive functions; his speech was slightly slurred; he exhibited tonic maintenance following muscle tension – especially of the bilateral hands and upper extremities; there were no tremors; there was muscle atrophy throughout; and there was diffuse weakness with tonic maintenance of effort. Tr. 615-616. Dr. Smith assessed myotonic dystrophy (primary) and mental retardation. Tr. 615. Dr. Smith referred Hinds to Dr. Goldstein a cardiologist and Hinds was encouraged to continue with psych. Tr. 615.

Upon Dr. Smith's referral, on May 21, 2015, Hinds saw Robert N. Goldstein, M.D., at LakeHealth Electrophysiology. Tr. 629-630. Dr. Goldstein noted the following general comments regarding the history of Hinds' present illness – Hinds had a history of myotonic dystrophy along with a variety of psychiatric problems, including depression, bipolar disorder, and low IQ; he had episodes of palpitations on occasion but no frank syncope for the prior six

years; he had heartburn; Hinds was fairly active with no exertional symptoms; he had no orthopnea or dyspnea with exertion; and Hinds had not had a cardiac work-up.  Tr. 629.  On physical examination, Dr. Goldstein observed that Hinds was a markedly thin male in no acute distress; his affect was appropriate; and his mood was pleasant.  Tr. 629.  Hinds' heart sounds were normal, there were no murmurs, gallops or rubs.  Tr. 629.  Hinds exhibited normal peripheral pulses bilaterally in the extremities and there was no edema.  Tr. 629.  Neurological findings were "grossly normal: intact, no abnormalities."  Tr. 629.  An EKG was performed that same day and it showed normal sinus rhythm; moderate voltage criteria for LVH that may represent a normal variant in light of Hinds' thin body habitus; and early repolarization abnormality.  Tr. 630, 649.  Dr. Goldstein assessed myotonic dystrophy (primary) and palpitations and he recommended an echocardiogram and a 2-week event monitor to further assess for arrhythmia.  Tr. 629-630.  The two-week event monitor findings showed a minimum heartrate of 43 bpm, a maximum heartrate of 181 bpm, and an average heartrate of 86 bpm.  Tr. 631-640.  An echocardiogram was performed on June 25, 2015.  Tr. 660-662.  The impression from that testing was that global left ventricular wall motion and contractility were within normal limits, there was an estimated ejection fraction of > 60% and there was a trace of mitral regurgitation.  Tr. 662, 668-672.

On October 1, 2015, Hinds saw Dr. Smith for follow up regarding his myotonic dystrophy and complaints of problems swallowing that Hinds had been having for about a month.  Tr. 703-704.  Dr. Smith's physical examination findings (Tr. 703-704) were similar to the findings from February 2015 (Tr. 615-616).  Dr. Smith referred Hinds to SLP[3] for evaluation. Tr. 703.

---

[3] SLP likely stands for speech-language pathologist.

*Mental Impairments*

On February 6, 2014, Hinds saw Jeffery Turell, M.D., at Premier Behavioral Health Services.  Tr. 596-597.  Dr. Turell noted he had last seen Hinds in October 2013.  Tr. 596.  Hinds reported that he broke his thumb punching a punching bag hard.  Tr. 596.  Hinds was drinking regularly but did not see that alcohol was a problem in his life.  Tr. 596.  He noted, however, that his friends had conducted an "intervention" with him about his alcohol use and he had received a citation for disorderly conduct while intoxicated about two months prior – he was walking home after drinking.  Tr. 596.  Hinds reported that Adderall helped him focus.  Tr. 596. He had reduced the amount of Trazadone that he was taking because it was too sedating.  Tr. 596.  Hinds had been doing some work at his mother's apartment building – cleaning and painting.  Tr. 596. Also, he was doing some interior construction type work with some friends to help them out – he was not getting paid.  Tr. 596.  Dr. Turell noted that Hinds was continuing to see Dr. Bruder[4] for counseling.  Tr. 596.  Hinds denied a depressed mood or anxiety symptoms and indicated his sleep and appetite were fine.  Tr. 596.  Dr. Turell observed Hinds to be casually dressed; he was cooperative; he was clam; his speech was fluent, spontaneous, and low; his thought process was concrete; he denied suicidal ideation; his cognition was grossly average to below average; his insight was limited; and his judgment was poor.  Tr. 597.  Dr. Turell's assessment was that Hinds continued to make poor decisions; he was in denial about the problems alcohol was causing in his life; his mood was stable; Adderall was helping with concentration; he had not yet obtained IQ testing; and he had stumbled upon types of work that he might do well in rather than jobs he had applied for in the past that he did not do well in.  Tr. 597.  Dr. Turell diagnosed bipolar II disorder, ADHD combined type, alcohol abuse and a reading disorder.  Tr. 597.  Dr. Turell

---

[4] This treatment note likely refers to Dr. Brunner rather than Dr. Bruder.  *See* Tr. 701 (August 20, 2015, letter from Dr. Rick Brunner, Ph.D., M.S.W., indicating he had provided therapy services to Hinds since 2009).

reduced Hinds' Trazadone and recommended that Hinds cut down on his drinking and complete IQ testing. Tr. 597.

During a May 8, 2014, visit with Dr. Turell, Hinds stated he was a loser and people did not give him a chance. Tr. 598. Adderall was continuing to help with his concentration; his appetite was the same; and he was not drinking as often. Tr. 598. Hinds was unemployed and living with his parents. Tr. 598. Dr. Turell's assessment was depressed/poor self-worth based on life circumstances and medical problems. Tr. 598. Diagnoses included bipolar II disorder, ADHD combined type, alcohol abuse; adjustment disorder with anxiety; and reading disorder. Tr. 598.

Hinds saw Dr. Turell again on August 7, 2014. Tr. 599. Hinds had a job at Walmart. Tr. 599. Hinds was interested in increasing his Adderall to help with his concentration due to the increased demands of work. Tr. 599. Hinds had a girlfriend. Tr. 599. Diagnoses included bipolar II disorder, ADHD combined type, alcohol abuse; anxiety disorder, NOS; and reading disorder. Tr. 598. Dr. Turell continued to recommend cognitive testing. Tr. 599. Hinds had not been able to schedule the testing due to conflicts. Tr. 599. Dr. Turell increased Hinds' Adderall and continued his other medications. Tr. 599.

Hinds saw Dr. Turell on January 8, 2015. Tr. 600. Hinds had been fired from Walmart after a cart had hit a car. Tr. 600. Hinds had a job interview scheduled for January 12, 2015. Tr. 600. Hinds was going snowboarding. Tr. 600. Hinds had neuropsychological testing performed on October 9, 2014.[5] Tr. 600. Hinds reported inconsistent medication compliance. Tr. 600. Hinds indicated that periods of sadness lasted about an hour and then faded. Tr. 600. His up moods lasted longer – "for days, weeks." Tr. 600. On mental examination, Dr. Turell observed

---

[5] The October 9, 2014, testing results are discussed more fully below in the opinion evidence section.

that Hinds' mood was better than usual. Tr. 600. He was cooperative. Tr. 600. His affect was flat. Tr. 600. His speech was fluent, spontaneous, increased and his tone was low. Tr. 600. His thought process was circumstantial; his cognition was diminished; his insight was partial; and his judgment was poor. Tr. 600. Diagnoses were bipolar II disorder, ADHD combined type, alcohol abuse; anxiety disorder, NOS; reading disorder; and borderline intellectual functioning. Tr. 600. Dr. Turell encouraged good sleep hygiene and he made some modifications to Hinds' medications. Tr. 600. Hinds denied medication side effects. Tr. 600.

When Hinds saw Dr. Turell on June 25, 2015, he relayed that he had been denied social security disability. Tr. 643. Hinds was planning on appealing. Tr. 643. Hinds was living with a roommate in a house. Tr. 643. Hinds reported inconsistent medication compliance, noting he had probably missed a few days. Tr. 643. Hinds reported being irritable but he denied a depressed mood, anxiety, elevated mood or psychosis. Tr. 643. He was frustrated with myotonic dystrophy and social security. Tr. 643. On mental examination, Hinds' affect was frustrated; his mood was congruent; his speech was fluent, spontaneous, increased but at a slow rate, with a low tone, and his voice was gravelly; his thought process was circumstantial, concrete, and he perseverated; his cognition was average and grossly intact; his insight was partial and his judgment was poor. Tr. 643. Dr. Turell assessed Hinds as being stable, noting he had been denied social security disability and was unable to hold a job. Tr. 643. Dr. Turell continued to diagnose bipolar II disorder, ADHD combined type, alcohol abuse; anxiety disorder, NOS; reading disorder; and borderline intellectual functioning. Tr. 643. Dr. Turell recommended that Hinds continue with his current treatment and he encouraged regular exercise and Hinds' appeal of the social security decision. Tr. 643.

Hinds saw Dr. Turell again on October 15, 2015. Tr. 713. Hinds reported being compliant with his medication. Tr. 713. However, he did relay that he has taken his girlfriend's medication one time. Tr. 713. Hinds' kitten had died which was causing him to feel down. Tr. 713. Hinds' quality of sleep was terrible. Tr. 713. Trazadone was no longer helping Hinds' sleep. Tr. 713. Hinds reported anxiety regarding his girlfriend's health. Tr. 713. On mental examination, Dr. Turell observed Hinds' mood was sad; his affect was down; his voice was gravelly with fluent, spontaneous and increased speech with a low tone; his thought process was circumstantial and concrete; his cognition was limited; his insight was partial and his judgment was poor. Tr. 713. Dr. Turell discontinued Trazadone, added melatonin, and continued all other treatment. Tr. 713. Dr. Turell continued to encourage regular exercise and advised him not to take someone else's medication. Tr. 713.

Hinds continued to see Dr. Turell from January 27, 2016, through January 12, 2017. Tr. 719-724, 726-730, 736-740, 747-749, 754-756. During a January 17, 2016, visit, Hinds reported that he was doing "pretty good" since his last visit in October. Tr. 724. He was a little more depressed – he was waiting for his girlfriend to get out of the hospital. Tr. 724. Hinds' concentration was fine on Adderall. Tr. 724. Hinds had gotten a place in Eastlake. Tr. 724. He had been with his girlfriend for six months. Tr. 724. Dr. Turell continued Hinds' current treatment and encouraged regular exercise. Tr. 723.

During an April 21, 2016, visit, Dr. Turell's assessment was that Hinds reported mild irritability; he was living a disorganized life but at his baseline. Tr. 721. Dr. Turell made some medication adjustments. Tr. 721. He recommended that Hinds engage in daily physical activity; he should use Adderall regularly, not just on the days/times he thinks he needs to, and he should see a speech pathologist for his swallowing difficulties. Tr. 721.

On June 16, 2016, Hinds complained of poor concentration, anxiety regarding his future health, ADHD symptoms, pain in his hands, and frustration and irritability.  Tr. 736.  He denied a depressed mood.  Tr. 736.  Hinds had run out of Adderall on June 5.  Tr. 736.  Dr. Turell restarted Adderall and continued Abilify and Lamictal.  Tr. 739.  Dr. Turell indicated that Hinds had "a clear and convincing burden of physical and mental conditions affecting his ability to work."  Tr. 738.

During a September 22, 2016, visit, Hinds reported that he did not like how his medication made him feel.  Tr. 726.  Hinds felt he was more depressed on Abilify and Lamictal.  Tr. 726.  He reported a better mood since getting back with his girlfriend – they were living together.  Tr. 726.  His mother and girlfriend were at the visit with him.  Tr. 726.  Hinds had stopped drinking.  Tr. 726.  He continued to smoke about a pack of cigarettes per day.  Tr. 726.  Dr. Turell discontinued Abilify and Lamictal, continued Adderall and added Depakote.  Tr. 727.  Dr. Turell noted he was going to write a letter for disability.  Tr. 727.

During a December 8, 2016, visit with Dr. Turell, Hinds requested standardized psychological testing and a letter describing his problems and situation.  Tr. 747.  Hinds was very angry at the judge.  Tr. 747.  On mental examination, Hinds' speech was fluent and spontaneous; his thought process was tangential, concrete, and he perseverated; his affect was angry/frustrated; he was cooperative but animated; and he reported having interesting dreams.  Tr. 747.  Hinds was not drinking but he continued to smoke. Tr. 747.  Dr. Turell increased Hinds' Depakote and continued Adderall.  Tr. 748.  Dr. Turell noted that Hinds was still impulsive and clearly unable to work and that Hinds' plans to apply for disability were appropriate.  Tr. 749.

During his January 12, 2017, visit with Dr. Turell, Hinds reported doing "pretty good." Tr. 754. He was applying for social security disability for the sixth time and was very angry at the judges. Tr. 754. He denied a depressed mood but had anxiety over losing his girlfriend. Tr. 754. Hinds' affect was described as amused and animated. Tr. 755. He denied suicidal ideation but indicated he had thoughts of judges committing suicide. Tr. 755. He relayed homicidal ideation towards a woman in North Carolina but noted he would never see her again. Tr. 755. In his assessment, Dr. Turell indicated that Hinds was stable but he still displayed poor judgment and anger and he made vague threatening statements but did not act on them. Tr. 755.

### 2. Opinion evidence

_Physical Impairments_

#### _Treating_

On December 22, 2015, Dr. Smith completed a functional capacity evaluation.[6] Tr. 713-714. Dr. Smith opined that Hinds was limited to rarely lifting/carrying 5-10 pounds; standing/walking a total of 1-2 hours in an 8-hour workday; and he could never climb, balance, stoop, crouch, kneel or crawl. Tr. 714. Also, Dr. Smith opined that Hinds' impairment affected his ability to be around temperature extremes or vibration because Hinds' muscle weakness was likely worse in the cold and with vibration. Tr. 714. Dr. Smith opined that she would expect Hinds to miss more than 4 days per month of work and would be off task more than 20% of the time due to pain or fatigue. Tr. 715. If Hinds was working a sedentary job, Dr. Smith opined that Hinds would need to lie down 2 hours or more during an 8-hour workday. Tr. 715. Dr.

---

[6] Dr. Smith also completed a functional capacity evaluation on December 12, 2017, after the ALJ's October 17, 2017, decision. Tr. 7-9, 14. That opinion was submitted to the Appeals Council only. Tr. 6, 477. Thus, the opinion is not summarized herein because it was not submitted to the ALJ and there is no request for a sentence six remand. _See Bass v. McMahon_, 499 F.3d 506, 513 (6th Cir. 2007); _Foster v. Halter_, 279 F.3d 348, 357 (6th Cir. 2001) (cases indicating that a court cannot consider evidence that was not submitted to the ALJ in the sentence four context; it can consider such evidence only in determining whether a sentence six remand is appropriate).

Smith opined that Hinds would be able to use his hands less than 10% of the time during an 8-hour workday.  Tr. 715.  Dr. Smith opined that Hinds would need to take unscheduled breaks more than 4 times per day (beyond normal morning, lunch, and afternoon breaks).  Tr. 715.  Dr. Smith explained her opinions, stating Hinds "has myotonic dystrophy, which is a condition marked by progressive muscle impairment, difficulty releasing muscle contraction, and frequently, cardiomyopathy."  Tr. 715.  Dr. Smith stated further, "Myotonic dystrophy is progressively disabling and results in death [and] he is unable to be employed in any setting on a long-term basis."  Tr. 715.

### *Reviewing*

On May 7, 2015, state agency reviewing physician William Bolz, M.D., completed a physical RFC assessment.  Tr. 111-114.  Dr. Bolz opined that Hinds had the RFC to lift and/or carry 20 pounds occasionally and 10 pounds frequently; he could stand and/or walk for a total of about 6 hours in an 8-hour workday and sit for a total of about 6 hours in an 8-hour workday; he had limited ability to push and/or pull with his upper extremities bilaterally – limited to frequently using hand controls due to myotonic dystrophy; he could never climb ladders/ropes/scaffolds due to myotonic dystrophy; he was limited to frequent bilateral handling and fingering; and he would have to avoid all exposure to hazards – machinery and unprotected heights – due to myotonic dystrophy.  Tr. 111-113.

Upon reconsideration, on August 26, 2015, state agency reviewing physician Paul Morton, M.D., reached the same conclusions as Dr. Bolz.  Tr. 129-131.

*Mental Impairments*

***Treating***

Dr. Turell

On January 5, 2016, Dr. Turell completed a Mental Source Assessment (Mental) wherein he rated Hinds' functional abilities in 20 work-related tasks related to understanding and memory; sustained concentration and persistence; social interaction; and adaptation. Tr. 716-718. Dr. Turell found that Hinds was unable to perform of 13 of the 20 tasks; he would have noticeable difficulty performing 1 of the tasks more than 20% of the workday or workweek; he would have noticeable difficulty performing 2 of the tasks 11-20% of the workday or workweek; and he would have noticeable difficulty performing 4 of the tasks no more than 10% of the workday or workweek. Tr. 716-717. Dr. Turell opined that Hinds would likely be absent from work about 4 days per month; he would be off task 20% of the time during the workday; and he would need to take unscheduled 15-minutes breaks beyond the normal breaks and lunch period more than 4 times per day. Tr. 717. Dr. Turell explained that his opinions were supported by neuropsychological testing completed by Dr. Mekota, an associate in his office, which showed a full-scale IQ in the borderline range, low average attention/processing speed, calculation, concentration with impairment of inhibitory control. Tr. 718. Dr. Turell added further comments, indicating:

> Given Tyler's consistent history of difficulty with applying for jobs, limited success being offered an interview, and short duration of holding a job before getting fired, Tyler has not shown the ability to maintain full-time employment which also fits with a history of poor decision-making.
>
> The difficulty he faces as a result is that "trouble finds Tyler," meaning due to deficits in executive function, intellectual function, and social skills, he invariably performs or behaves in way that results in dismissal/termination of employment.

Tr. 718.

On April 20, 2017, Dr. Turell completed another Mental Source Assessment (Mental) wherein he again rated Hinds' functional abilities in 20 work-related tasks related to understanding and memory; sustained concentration and persistence; social interaction; and adaptation. Tr. 763-764. Dr. Turell found that Hinds was unable to perform of 13 of the 20 tasks; he would have noticeable difficulty performing 1 of the tasks more than 20% of the workday or workweek; he would have noticeable difficulty performing 3 of the tasks no more than 10% of the workday or workweek; and no problem performing 2 of the tasks. Tr. 763-764. Dr. Turell opined that Hinds would likely be absent from work about 3 days per month; he would be off task over 20% of the time during the workday; and he would need to take unscheduled 15-20-minute breaks beyond the normal breaks and lunch period about 4 times per day. Tr. 764. When asked to state the medical findings that supported his opinions, Dr. Turell stated:

> Tyler suffers from ADHD, bipolar disorder, and myotonic dystrophy. These conditions affected his academic trajectory, for which he had an IEP in school. Tyler has an easygoing nature but is plagued by poor decision-making and poor concentration resulting in difficulty obtaining and maintaining employment. Tyler has tried many jobs, but has been fired from all of them after only a short time. Trouble always seems to find Tyler, and in the workplace this results in termination of his employment.

Tr. 764-765.

Dr. Turell further commented that "Tyler is truly incapable of full-time employment. Aside from his issues with poor concentration, it is his poor executive function and decision making that render him unemployable." Tr. 765.

Dr. Brunner

On August 20, 2015, Rick Brunner, Ph.D., M.S.W., authored a "To Whom It May Concern" letter, wherein he expressed his sincere and full support for Hinds' application for

disability benefits. Tr. 701. Dr. Brunner stated he had been meeting with Hinds (and his mother) since 2009 for approximately 50 therapy sessions. Tr. 701. During that therapy, Dr. Brunner indicated he had encouraged Hinds to find employment and had referred him to BVR because of the difficulties he was having finding work. Tr. 701. Dr. Brunner indicated that BVR had recently closed Hinds' case and suggested that he apply for disability. Tr. 701. Dr. Brunner relayed that Hinds had been diagnosed with ADHD and bipolar disorder and, despite taking prescribed medications, he continued to struggle with focus, poor decision making, impulsivity, and mood swings. Tr. 701. Dr. Brunner stated further that Hinds would love to work but "due to his psychiatric struggles and now his battle with Myotonic Dystrophy, he is often full of despair regarding his future." Tr. 701.

On May 3, 2017, Dr. Brunner completed a Mental Source Assessment (Mental) wherein he rated Hinds' functional abilities in 20 work-related tasks related to understanding and memory; sustained concentration and persistence; social interaction; and adaptation. Tr. 821-823. Dr. Brunner found that Hinds was unable to perform 8 of the 20 tasks; he would have noticeable difficulty performing 11 of the tasks more than 20% of the workday or workweek; and he would have noticeable difficulty performing 1 of the tasks 11-20% of the workday or workweek. Tr. 821. Dr. Brunner opined that Hinds would likely be absent from work more than 4 days per month; he would be off task over 20% of the time during the workday; and he would need to take unscheduled 15-minutes breaks beyond the normal breaks and lunch period about 4 times per day. Tr. 822. When asked to state the medical findings that supported his opinions, Dr. Brunner indicated "ongoing ADHD, bi-polar & borderline I.Q." Tr. 822. Dr. Brunner commented further that Hinds had not been able to maintain full-time employment in the past even with the ongoing assistance and supervision of a job coach. Tr. 822.

On May 12, 2017, Dr. Brunner provided another letter wherein he stated that he fully supported Hinds' applying for disability benefits. Tr. 825-826. Dr. Brunner offered his opinion as to why he believed that Hinds' impairments fell within Listings 12.04 and 12.05. Tr. 825. In his letter, Dr. Brunner characterized Hinds' impairments as having a marked or extreme effect on his ability to function in his daily life. Tr. 825.

### *Examining*

Drs. Mekota & Afsarifard

On October 9, 2014, upon Dr. Turell's referral, Ryan Mekota, Psy.D., and Farshid Afsarifard, Ph.D., conducted a neurological evaluation to assess Hinds' neurocognitive status and to provide assistance with treatment recommendations. Tr. 601-605. Hinds relayed that he had problems focusing for extended periods of time but noted that his concentration improved when he took Adderall. Tr. 601. Hinds also relayed having ongoing problems with language and comprehension and depression 2-3 weeks before, stating he was upset over the person he saw in the mirror. Tr. 601. Hinds also noted physical problems, including myotonia, light-headedness and balance difficulty. Tr. 601. Hinds indicated he had recently been laid off from Walmart after a scheduling mishap. Tr. 602. He was unemployed at the time and living in a trailer with a woman. Tr. 602. He reported spending his free time writing rap music with his friends. Tr. 602.

Drs. Mekota and Afsarifard observed that Hinds' affect was elevated and slightly more juvenile in presentation than his stated age. Tr. 602. Hinds' speech was rapid in rate but within normal limits for volume and prosody; his thought processes were tangential/circumstantial at times and required redirection; his insight and judgment were partial; and he was cooperative and effortful throughout the evaluation. Tr. 602. Testing revealed a full-scale IQ of 79. Tr. 603.

Drs. Mekota and Afsarifard opined that Hinds' "neurological profile revealed a man of borderline intellectual functioning who demonstrated cognitive deficits primarily in the domains of verbal comprehension and executive functions. Emotionally, he endorsed symptoms consistent with major depression." Tr. 604. They indicated that Hinds' "cognitive deficits are consistent with cognitive sequelae associated with myotonic dystrophy, major depressive disorder, and stimulant use." Tr. 604.

As part of their recommendations, Drs. Mekota and Afsarifard stated that "[g]iven [Hinds'] borderline intellectual functioning, executive impairment, neuromuscular impairment, and employment history, Mr. Hinds is judged to be an appropriate candidate for Social Security Disability benefits." Tr. 604. They recommended reevaluation of Hinds' bipolar disorder in the absence of Adderall use, noting that it could be contributing to impulsive or risky behaviors and a hyperverbal/hypomanic presentation. Tr. 604. They also noted that Hinds' use of Adderall could be masking significant underlying depressive symptoms and stated that if Hinds' depression was successfully treated it could improve his energy level, concentration and judgment. Tr. 604-605. While making recommendations regarding reevaluation of Hinds' psychiatric medications, Drs. Mekota and Afsarifard noted that they deferred to the expertise of Dr. Turell. Tr. 605. As part of their recommendations, Drs. Mekota and Afsarifard encouraged Hinds to perform tasks in a serial fashion rather than multiple tasks at once. Tr. 605.

<u>Dr. Parsons</u>

On April 7, 2017, upon referral of Dr. Brunner, Michael W. Parsons, Ph.D., evaluated Hinds to assist with characterizing cognitive deficits that Hinds experienced.[7] Tr. 757-762. Testing revealed a full-scale IQ score of 72, which was within the borderline range. Tr. 760.

---

[7] Hinds' mother was present and interviewed by Dr. Parsons along with Hinds. Tr. 757.

Dr. Parsons observed that Hinds had characteristics of myotonic dystrophy, including very thin forearms suggesting atrophic musculature, thin face and temporal balding.  Tr. 759.  Hinds' motor control was affected, with difficulty relaxing his grip after clenching his fists.  Tr. 759.  Hinds' affect showed a broad range and variability and Hinds had a tendency to become irritated quickly by certain topics such as his restricted driving but then he would quickly subside.  Tr. 759.  Hinds' spontaneous speech was mildly dysarthric with a slightly liquid/lisped quality.  Tr. 759.  Hinds' auditory verbal comprehension was intact and he had no difficulty comprehending task instructions.  Tr. 759.  Hinds' problem-solving style was mildly impulsive and he had a tendency to fidget.  Tr. 759.  Hinds was mildly distracted but was able to put forth a consistent effort during the evaluation.  Tr. 759.

Dr. Parsons provided his impressions and recommendations, stating that his neurological evaluation showed a pattern a of "mild but global cognitive impairment."  Tr. 761.  Hinds had deficits in intellectual function, attention, executive function, memory, language, and visuospatial skill.  Tr. 761.  Dr. Parsons indicated that the "presence of cognitive impairment is not unexpected in this young man with Myotonic Dystrophy type I, as it is a common feature of the disease."  Tr. 761.  Also, Dr. Parsons indicated that Hinds had a history of neuropsychiatric difficulties with mood regulation and impulse control which could be attributable to his congenital neurologic disease.  Tr. 761.  Dr. Parsons stated "It is my opinion, to a reasonable degree of medical certainty, that these cognitive deficits alone are disabling.  In combination with his physical/motoric symptoms, there is no doubt in my mind that he cannot be expected to succeed in a competitive workplace environment."  Tr. 761.

_**Reviewing**_

On May 7, 2015, state agency reviewing psychologist Paul Tangeman, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 108-110) and Mental RFC Assessment (114). Dr. Tangeman adopted the PRT and RFC from the ALJ's decision of April 5, 2013.[8] Tr. 114. In doing so, Dr. Tangeman found no restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation, each of extended duration. Tr. 109. Dr. Tangeman also found that Hinds had the following non-exertional limitations – unskilled work that is the simplest in the United States economy, no higher than GED 2 reasoning, GED 1 math, GED 1 reading, which can be learned on short demonstration and which does not involve serving the public or frequent communication. Tr. 114.

Upon reconsideration, on September 3, 2015, state agency reviewing psychologist Karen Terry, Ph.D., completed a PRT (Tr. 126-128) and Mental RFC Assessment (Tr. 131-133). Dr. Terry did not adopt the PRT and RFC from the prior April 5, 2013, decision, because of the later diagnoses in the treatment records regarding substance abuse disorder and Hinds' denial as to how that disorder was impacting his life. Tr. 127. In the PRT, Dr. Terry found mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation, each of extended duration. Tr. 127. Dr. Terry found that Hinds retained the ability to perform routine job duties that remain static and are performed in a very structured, stable, predictable work setting that does not involve frequent changes, and any necessary

---

[8] As noted earlier, the ALJ did not adopt the RFC from the prior ALJ's decision. Plaintiff has not challenged that decision. _See_ FN 2 above.

changes need to occur infrequently and be adequately and easily explained ahead of time and at any time requested when learning novel tasks. Tr. 133. Also, as found by Dr. Tangeman, Dr. Terry found that Hinds had the following non-exertional limitations – unskilled work that is the simplest in the United States economy, no higher than GED 2 reasoning, GED 1 math, GED 1 reading, which can be learned on short demonstration and which does not involve serving the public or frequent communication. Tr. 133.

## C. Testimonial evidence

### 1. Plaintiff's testimony

Hinds was represented and testified at the hearing. Tr. 42-68. Hinds' girlfriend was temporarily living with him while she was between apartments – Hinds had helped his girlfriend find a place that was nicer than the apartment she had been living at. Tr. 44. Hinds' parents owned the house that he lived in. Tr. 45. Hinds indicated that his parents had purchased it for him because he would get evicted if he lived in an apartment. Tr. 45. Hinds mows the lawn at this house – he really does not spend time gardening though because he does not have the tools to do so. Tr. 45-46. Hinds' girlfriend takes care of most of the housework. Tr. 46. Hinds will try to do some chores but usually does not finish – he either falls asleep or just gives up on the task. Tr. 46. He is able to cook but it is nothing very complicated and he tries to cook only when he knows he is awake and that he will not fall asleep, which he stated he does a lot during the day. Tr. 46.

Hinds indicated he has "nighttime insomnia." Tr. 46. When he is up at night, Hinds works on his rapping and promoting along with a few friends. Tr. 46-47. Hinds really enjoys rap and working on getting a song finished. Tr. 47. He indicated it was something that was not affected by his disability. Tr. 47. Once they have made a recording, they put it on a CD and

then give the CDs away. Tr. 47. They cannot sell the CDs because the beats they use are other rappers' beats. Tr. 47. Hinds hopes to one day be able to become a signed rap musician and be able to sell his own music. Tr. 47-48. Hinds and his friends have been on stage performing their music before – usually about once a year they play at a bar. Tr. 49-50.

When asked what else Hinds does with his time, he indicated he plays videogames with a friend when his friend comes over. Tr. 48. If his friend is not around, Hinds usually spends time with his girlfriend at restaurants or at the mall. Tr. 48-49.

Hinds does not have his driver's license. Tr. 50. He had passed the written test but got a DUI while driving someone else's car with his temporary license. Tr. 50-51. He has not driven since. Tr. 51. He and his girlfriend walk or take the bus places. Tr. 48. When Hinds drove in the past he would take Adderall so he was able to stay focused. Tr. 51.

Hinds indicated he does not take his Adderall if he does not have anything important going on. Tr. 51. For example, he explained he did not take his Adderall the day of the hearing. Tr. 51. Hinds watches television and movies but it takes him a while to get through a program because he always has to call his mom to ask her what something means. Tr. 51-52. Hinds indicated that his academic ability is not at a 12th grade level but he is able to read and write enough to get through life. Tr. 52. Hinds usually gives any mail that he gets to his mom to handle for him. Tr. 52.

Hinds gets irritated and frustrated all the time with his myotonic dystrophy because his hands lock up and his hands also hurt at times. Tr. 53-54, 64-65. He explained that doing even simple things is impossible, for example, opening jars and water bottles. Tr. 55. His girlfriend usually opens those for him. Tr. 55. He is able to open pill bottles though because he has found a way to open those by turning them upside down and turning them. Tr. 56. He has some

difficulty with snaps.  Tr. 57.  He has weakness and tingling and numbness in his hands which has caused him to drop things.  Tr. 65, 66.  The tingling and numbness occurs about twice every day for about 25 minutes.  Tr. 66.  Hinds indicated that his weakness is limited to his hands but he noted you use your hands for almost everything.  Tr. 65.

Hinds has problems remembering things.  Tr. 57-58.  For example, he explained he will mow one part of the yard and forget to do the other part of the yard.  Tr. 58.  He is impulsive and does not think before doing things.  Tr. 58.  Hinds has some problems with anger but tries to keep it under control.  Tr. 59.

Hinds has problems with lightheadedness and dizziness, especially when he wakes up or stands up too fast.  Tr. 59.  It happens to him throughout the day and has caused him to fall and get sick to his stomach.  Tr. 60.  He has problems breathing and sometimes his heart just stops beating.  Tr. 61.

Hinds has problems remembering directions.  Tr. 63.  He will only remember part of directions he receives and forget the rest.  Tr. 63.  When he forgets what he is supposed to do, he will try to find someone to assist him.  Tr. 63.  Usually he cannot find someone so he will try to complete the task his own way and he ends up getting in trouble for not following the directions. Tr. 63.

Hinds indicated that he also has a speech impediment that makes it difficult for people to understand him and causes him to take longer to finish a sentence because he wants to make sure he is speaking clearly.  Tr. 67.

### 2.    Vocational Expert

Vocational Expert ("VE") Deborah Lee testified at the hearing.  68-71.  The ALJ informed the VE that, while Hinds had some work activity, she did not see any past relevant

work.  Tr. 68.  The ALJ asked the VE to consider an individual of Hinds' age and education

without past relevant work who has the RFC for light work with the ability to use bilateral upper

extremities frequently to operate hand controls; use bilateral upper extremities frequently for

handling and fingering; never climb ladders, ropes, or scaffolds; needs to avoid all exposure to

hazards such as industrial machinery and unprotected heights; ability to perform routine job

duties that remain static and are performed in a structured stable, predictable work setting; ability

to work in a setting where necessary changes occur infrequently and can be easily explained

ahead of time; ability to perform unskilled work categorized no higher than GED 2 for reasoning,

GED 1 for math, and GED 1 for reading that can be learned on short demonstration and which

does not involve serving the public or frequent communication with others.  Tr. 68-69.  The VE

indicated that light, unskilled jobs would be available to the described individual, including (1)

folder in laundry; (2) cleaner housekeeping; and (3) assembler small products.  Tr. 70.

Hinds' counsel asked the VE to consider the ALJ's hypothetical except to change the

hypothetical to state that the individual would only be able to use their hands, including for

operation of hand controls, handling, and fingering, for less than 10% of the workday.  Tr. 70.

The VE indicated that with that change in the hypothetical there would be no jobs available.  Tr.

70.  Also, the VE indicated there would be no jobs available at the sedentary level.  Tr. 70.

Hinds' counsel also inquired about acceptable levels of absenteeism and off-task time.  Tr. 70-

71.  The VE indicated that employers would tolerate no more than one day a month of being

absent and being off task no more than 20% of the time.  Tr. 71.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[9] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[10] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the

---

[9] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

[10] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 416.925.

national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v.*

*Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner

at Step Five to establish whether the claimant has the RFC and vocational factors to perform

work available in the national economy. *Id.*

## IV. The ALJ's Decision

In her October 17, 2017, decision, the ALJ made the following findings:[11]

1.   Hinds has not engaged in substantial gainful activity since November 13, 2014, the application date. Tr. 20.

2.   Hinds has the following severe impairments: muscular dystrophy; borderline intellectual functioning; affective disorder; attention deficit disorder (ADD); learning disorder; and anxiety disorder. Tr. 20.

3.   Hinds does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 20-22.

4.   Hinds has the RFC to perform light work as defined in 20 C.F.R. § 416.967(b) except he has the ability to use the bilateral upper extremities frequently to operate hand controls; ability to use the bilateral upper extremities frequently for handling and fingering; never climb ladders, ropes, or scaffolds; avoid all exposure to hazards such as industrial machinery, unprotected heights; ability to perform routine job duties that remain static and are performed in a structured, stable, predictable work setting; ability to work in a setting where necessary changes occur infrequently and can be easily explained ahead of time; ability to perform unskilled work categorized no higher than GED 2 reasoning, GED 1 math, GED reading, which can be learned on short demonstration and which does not involve servicing the public or frequent communication with others. Tr. 22-27.

5.   Hinds has no past relevant work. Tr. 27.

---

[11] The ALJ's findings are summarized.

6.      Hinds was born in 1990 and was 24 years old, which is defined as a younger individual age 18-49, on the date the application was filed. Tr. 27.

7.      Hinds has at least a high school education and is able to communication in English. Tr. 27.

8.      Transferability of job skill is not an issue because Hinds does not have past relevant work. Tr. 27.

9.      Considering Hinds age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Hinds can perform, including folder in laundry, cleaner/housekeeper, assembler, small products. Tr. 27-28.

Based on the foregoing, the ALJ determined that Hinds had not been under a disability, as defined in the Social Security Act, since November 13, 2014, the date the application was filed. Tr. 28.

## V. Plaintiff's Arguments

Hinds argues that the ALJ erred at Step Three when she found that Hinds' impairments or combination of impairments did not meet or equal Listing 11.13. Doc. 15, pp. 17-22, Doc. 19, pp. 1-4. Hinds also argues that the ALJ erred by failing to assign great or controlling weight to opinions rendered by Hinds' treating and examining physicians and psychiatrists/psychologists. Doc. 15, pp. 22-25, Doc. 19, pp. 4-5.

## VI. Law & Analysis

### A.      Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.      Reversal and remand is not warranted**

Hinds argues that the ALJ erred at Step Three by finding that his impairment or combination of impairments did not meet or medically equal Listing 11.13. He also argues that the ALJ erred in weighing the medical opinions rendered by his treating and examining physicians and/or psychiatrist and psychologists. Hinds contends that there is evidence, including the medical opinion evidence and other objective testing, sufficient to satisfy the requirements in both subdivisions A and B of Listing 11.13.

At Step Three of the disability evaluation process, a claimant will be found disabled if his impairment(s) meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). The claimant bears the burden of establishing that his condition meets or equals a Listing. *Thacker v. SSA*, 93 Fed. Appx. 725, 727-728 (6th Cir. 2004) (citing *Buress v.*

*Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987)).  Thus, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker* 93 Fed. Appx. at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)).  "Each listing specifies 'the objective medical and other findings needed to satisfy the criteria of that listing.'" *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414 (6th Cir. 2011).  "A claimant must satisfy all the criteria to 'meet' the listing." *Id.*  "[A]claimant is also disabled if her impairment is the *medical equivalent* of a listing[.]" *Id.*  (emphasis in original).  In assessing equivalency, an ALJ "looks to the opinions of the state agency medical advisors and/or the opinion of a testifying medical expert for guidance on the issue of whether the medical findings are at least equal in severity and duration of the listing findings." *Johnson v. Colvin*, 2014 WL 1418142, *3 (W.D. Ky. Apr. 14, 2014) (citing 20 C.F.R. § 404.1526).  There is no heightened articulation standard at Step Three.  *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 411 (6th Cir. Jan. 31, 2006) (unpublished).

Listing 11.13 states: [12]

11.13 Muscular dystrophy, characterized by A or B:

A. Disorganization of motor function in two extremities (see 11.00D1), resulting in extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities; or

B. Marked limitation (see 11.00G2) in physical functioning (see 11.00G3a), and in one of the following:

1. Understanding, remembering, or applying information (see 11.00G3b(i)); or
2. Interacting with others (see 11.00G3b(ii)); or
3. Concentrating, persisting, or maintain pace (see 11.00G3b(iii)); or
4. Adapting or managing oneself (see 11.00G3b(iv)).

---

[12] This version of Listing 11.13 was in effect at the time of the ALJ's October 17, 2017, decision.

20 C.F.R. § Pt. 404, Subpt. P, Appx. 1, Pt. A2.

As explained in 11.00D1, "disorganization of motor function" means:

[I]interference, due to your neurological disorder, with movement of two extremities; i.e., the lower extremities, or upper extremities (including fingers, wrists, hands, arms, and shoulders). By two extremities we mean both lower extremities, or both upper extremities, or one upper extremity and one lower extremity. All listings in this body system, except for 11.02 (Epilepsy), 11.10 (Amyotrophic lateral sclerosis), and 11.20 (Coma and persistent vegetative state), include criteria for disorganization of motor function that results in an extreme limitation in your ability to:

a. Stand up from a seated position; or
b. Balance while standing or walking; or
c. Use the upper extremities (including fingers, wrists, hands, arms, and shoulders).

20 C.F.R. § Pt. 404, Subpt. P, Appx. 1, Pt. A2.

11.00D2 explains "extreme limitation" as follows:

2. Extreme limitation means the inability to stand up from a seated position, maintain balance in a standing position and while walking, or use your upper extremities to independently initiate, sustain, and complete work-related activities. The assessment of motor function depends on the degree of interference with standing up; balancing while standing or walking; or using the upper extremities (including fingers, hands, arms, and shoulders).

***
c. Inability to use your upper extremities means that you have a loss of function of both upper extremities (including fingers, wrists, hands, arms, and shoulders) that very seriously limits your ability to independently initiate, sustain, and complete work-related activities involving fine and gross motor movements. Inability to perform fine and gross motor movements could include not being able to pinch, manipulate, and use your fingers; or not being able to use your hands, arms, and shoulders to perform gross motor movements, such as handling, gripping, grasping, holding, turning, and reaching; or not being able to engage in exertional movements such a lifting, carrying, pushing, and pulling.

20 C.F.R. § Pt. 404, Subpt. P, Appx. 1, Pt. A2.

11.00G2 explains "marked limitation" as follows:

2. Marked Limitation. To satisfy the requirements of the functional criteria, your neurological disorder must result in a marked limitation in physical functioning and a marked limitation in one of the four areas of mental functioning (see 11.00G3).

Although we do not require the use of such a scale, "marked" would be the fourth point on a five-point scale consisting of no limitation, mild limitation, moderate limitation, marked limitation, and extreme limitation. We consider the nature and overall degree of interference with your functioning. The term "marked" does not require that you must be confined to bed, hospitalized, or in a nursing home.

a. Marked limitation and physical functioning. For this criterion, a marked limitation means that, due to the signs and symptoms of your neurological disorder, you are seriously limited in the ability to independently initiate, sustain, and complete work-related physical activities (see 11.00G3). You may have a marked limitation in your physical functioning when your neurological disease process causes persistent or intermittent symptoms that affect your abilities to independently initiate, sustain, and complete work-related activities, such as standing, balancing, walking, using both upper extremities for fine and gross movements, or results in limitations in using one upper and one lower extremity. The persistent and intermittent symptoms must result in a serious limitation in your ability to do a task or activity on a sustained basis. We do not define "marked" by a specific number of different physical activities or tasks that demonstrate your ability, but by the overall effects of your neurological symptoms on your ability to perform such physical activities on a consistent and sustained basis. You need not be totally precluded from performing a function or activity to have a marked limitation, as long as the degree of limitation seriously limits your ability to independently initiate, sustain, and complete work-related physical activities.

20 C.F.R. § Pt. 404, Subpt. P, Appx. 1, Pt. A2.

At Step Three, the ALJ analyzed Hinds' impairments under Listing 11.13 and concluded that Hinds did not have an impairment or combination of impairments that met or equaled one of the listed impairments. Tr. 20. In assessing Hinds' impairment(s) under Listing 11.13, the ALJ stated the following:

The undersigned considered the claimant's muscular dystrophy under the criteria of listing 11.13. However, the medical evidence of record does not demonstrate disorganization of motor function in two extremities, resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities. While the claimant's muscular dystrophy affects the use of his hands, the record does no show that he has extreme limitations for the reasons discussed under Finding 4. Additionally, the impairment does not cause marked limitation in physical functioning and in one of the following: 1) understanding, remembering, or applying information; 2) interacting with others; 3) concentrating, persisting, or maintaining pace; or 4) adapting or managing oneself.

Tr. 20.

Under Finding 4, the ALJ discussed Hinds' myotonic dystrophy, including how it

affected Hinds' use of his hands, stating:

> As for the claimant's neurological impairments, the record shows that the claimant presented with complaints of hands locking and was assessed with myotonic dystrophy type I since [at]least May 2014 (B3F/9-11). The medical evidence does indeed include findings of reduced strength in the hands and difficulty relaxing his grip with electrophysiologic evidence consistent with myotonic dystrophy and possible mild carpal tunnel syndrome. There are also observations of a gravelly voice and slightly slurred speech (B3F/10; B6F/8; B15F/3; B20F/2; B23F/3). However, the claimant has had intact sensory function and coordination (B6F/5; B15F/3; see also B3F/8; B8F/3), and there are no complaints of physical pain or tingling in the treating records, contrary to the claimant's testimony. Speech has remained fluent and spontaneous (B4F/4; B20F/2). Cardiology workup has been negative for any cardiac abnormalities related to the claimant's myotonic dystrophy (B3F/7, 19; B8F/4; B12F/5).
>
> Once again, the claimant's reported daily activities are inconsistent with the limitations allegedly caused by his myotonic dystrophy. He plays video games, writes, uses a lawn mower, a[n]d prepares meals. These all require greater use of the hands than alleged. Moreover, during an office visit, the claimant himself denied any problems with his hands while eating, shaving, or writing (B3F/9), 11; see also B26F/28). There are also notations that the claimant is able to be fairly active without having any exertional symptoms (B8F/3). He goes snowboarding (B9F/4), performs some odd jobs for his friends, neighbors, and mother, including cleaning, painting, helping with interior construction, and fixing things (B5F/3; B19F/1). Therefore, the undersigned finds that the claimant is able to use the upper extremities to the extent noted in the above residual functional capacity. The undersigned has also included social interaction limitations in view of the claimant's slight speech abnormalities. However, the claimant's alleged limitations are not supported by the record as a whole.

Tr. 24.

The ALJ's Step Three finding is sufficiently explained and supported by evidence.

However, Hinds asserts that the Step Three finding is flawed, arguing that he was diagnosed with

myotonic dystrophy type I; EMG/NCS testing from 2015 confirmed that diagnosis; and RFC

assessments completed by Dr. Smith in December 2015 and December 2017, objective findings

at physical examinations, Hinds' subjective complaints, and opinions rendered by treating mental

health providers (Dr. Turell and Dr. Brunner) and neuropsychological evaluations from 2014

(Drs. Mekota and Afsarifard) and 2017 (Dr. Parsons) demonstrate that his impairments cause

extreme and/or marked limitations.   However, Hinds has not shown that the ALJ ignored the

evidence relied upon by Hinds.[13]   And while Hinds disagrees with the ALJ's assessment of the

evidence, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor

decide questions of credibility." *Garner*, 745 F.2d at 387.   Additionally, Hinds has not

demonstrated that the ALJ's detailed explanation as to why Hinds' impairment or combination of

impairments did not satisfy Listing 11.13 is unsupported by substantial evidence.

Furthermore, Hinds reliance on medical opinion evidence to support his claim that he

meets Listing 11.13 is unavailing because he has not shown that the ALJ erred in her evaluation

or weighing of the medical opinion evidence.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling

weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable

clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the

other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d

365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc.

Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must

give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent

reviewers the weight given to the treating physician's opinion and the reasons for that weight.

*Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.   In deciding the weight to be given, the ALJ

must consider factors such as (1) the length of the treatment relationship and the frequency of the

---

[13] The ALJ did not consider Dr. Smith's December 2017 RFC.  However, the failure to do so was not error because
the opinion was prepared after the ALJ issued her decision.

examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 416.927(c). An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

Drs. Smith, Turell and Brunner were treating physicians/psychiatrists and Drs. Mekota, Afsarifard, and Parsons were non-treating psychologists who evaluated Hinds only once. Thus, the treating physician rule is not applicable to the opinions of Drs. Mekota, Afsarifard, and Parsons. Although not all the opinions were rendered by treating physicians, the ALJ weighed each of the opinions and explained the reasons for the weight assigned. More particularly, the ALJ assigned the following weight to the various opinions: Dr. Smith's opinion was assigned only some weight; Dr. Turell's opinions were assigned only some weight; Dr. Brunner's opinion was assigned little weight; Dr. Parsons' opinion was assigned only some weight; and the opinion rendered by Drs. Mekota and Afsarifard was assigned partial weight. Tr. 25-26. Furthermore, as detailed below, the ALJ explained the reasons for assigning the various weights.

With respect to the weight assigned to Dr. Smith's opinion, the ALJ explained:

Dr. Smith's treating records indeed show findings of diffused weakness in upper extremity motor strength and atrophy of muscle bulk and tone (B15F; B25F). However, the record also shows that the claimant performs activities of daily living that show a greater ability to function, such as mowing the yard, cleaning, performing odd jobs for friend and neighbors, snowboarding, and maintaining a fairly active lifestyle without exertional symptoms (B5F/3; B8F/3; B9F/4; B19F/1). Therefore, the undersigned finds that Dr. Smith's opinion is not entirely persuasive and therefore deserves only some weight.

Tr. 26.

With respect to the weight assigned to Dr. Turell's opinions, the ALJ explained:

Insofar as his opinions relate to whether an individual is disabled, these again are issues reserved to the Commissioner and therefore cannot be given special significance (20 CFR 416.927(e)). As for the other functional limitations that Dr. Turell assessed, the undersigned finds that they are not entirely persuasive, given the wide ranging activities that the claimant engages in. This includes the ability to live independently in his own home, prepare meals for himself, perform yardwork, engage in hobbies, and socialize with friends and a girlfriend in public settings. The undersigned finds somewhat persuasive the claimant's low-average attention and processing speed, calculation, and concentration with impairment of inhibitory control referenced by Dr. Turell and therefore assessed significant restrictions in the above residual functional capacity. However, the record overall does not support the limitations that Dr. Turell assessed.

Tr. 25.

With respect to weight assigned to Dr. Brunner's opinion, the ALJ explained:

These extreme limitations are not consistent with the record overall, which shows that the claimant has repeatedly reported effectiveness of Adderall on his concentration. He also reported that he feels like he has a purpose in life after starting Depakote (B9F/3; Bl9F/l, 6; B20F/12; B22F/3, 5). The claimant also engages in a wide variety of activities of daily living, including writing rap lyrics, performing on stage, and spending time with his girlfriend in public. Therefore, Dr. Brunner's opinion deserves little weight.

Tr. 26.

With respect to the weight assigned to the opinion rendered by Drs. Mekota and

Afsarifard, the ALJ explained:

An opinion on whether an individual is disabled goes to an issue reserved to the Commissioner and therefore cannot be given special significance (20 CFR 416.927(e)). However, insofar as the opinion shows that the claimant is limited to unskilled work with routine job duties, the undersigned accords it partial weight. The record does show that the claimant would require some mental limitations due to the claimant's history of attention deficit disorder, borderline intellectual functioning, and other mental disorders. The record does show that the claimant is prescribed Adderall for attentional difficulties and that the claimant has scored in the borderline range in intellectual testing. Therefore, overall, this opinion deserves partial weight.

Tr. 25.

With respect to the weight assigned to Dr. Parsons' opinion, the ALJ explained:

> Again, an opinion on whether an individual is disabled goes to an issue reserved to the Commissioner and therefore cannot be given special significance (20 CFR 416.927(e)). The undersigned did indeed consider the deficits in intellectual function, attention, executive function, memory, language, and visuospatial skills referenced by Dr. Parsons, but finds that the claimant remains capable of performing work within the above residual functional capacity. This is due to the claimant's activities of daily living, which require greater physical and motor functioning than opined by [] Dr. Parsons, such as mowing the lawn, performing odd jobs, and playing video games (B5F/3; Bl9F/l; hearing testimony). Therefore, Dr. Parsons's opinion deserves only some weight.

Tr. 25-26.

The crux of Hinds' argument as to why the ALJ erred when weighing the medical opinion evidence is that the ALJ consistently mentioned Hinds' activities of daily living as a basis for discounting the extreme and marked limitations contained in the various opinions. Hinds contends that being capable of performing some activities does not establish that his limitations are not marked or not extreme. And he argues that his "somewhat minimal activities are not comparable to typical competitive work activities." Doc. 19, p. 4. However, Hinds does not contend that he did not perform the activities noted by the ALJ and the Court is not persuaded by Hinds' attempt to downplay the activities noted by the ALJ as minimal.

Furthermore, as indicated above, consistency of an opinion with the record as a whole is a proper factor for the ALJ to consider when weighing opinion evidence. The record contains evidence showing that Hinds did engage in significant activities, many of which involved using his upper extremities, e.g., mowing the lawn, cleaning, painting, playing video games, writing rap lyrics, such that the Court finds it was proper for the ALJ to discount the extreme and marked limitations contained in the various opinions as being inconsistent with and not supported by the record. Moreover, the ALJ discounted the opinions for other reasons. For example, with respect to the opinion evidence indicating that Hinds was unable to work and/or that Hinds' impairments

were disabling, the ALJ properly found that those opinions were not entitled to any special weight since those opinions go to issues reserved to the Commissioner.

Additionally, Hinds argues that the ALJ erred in weighing the medical opinion evidence because the ALJ assigned great weight only to the reviewing state agency physicians/psychologists even though they did not examine him and did not review the full record. Although the state agency reviewers rendered opinions without the full record, the ALJ was not precluded from relying on or providing weight to those opinions. *See e.g. Helm v. Comm'r of Soc. Sec.*, 405 Fed. Appx. 997, 1002 (6th Cir. 2011) (indicating that "[t]here is no categorical requirement that the non-treating source's opinion be based on a 'complete' . . . case record). Moreover, Hinds has not demonstrated that the ALJ did not review or did not consider the entirety of the record, including records dated after the state agency reviewers' opinions. *See McGrew v. Comm'r of Soc. Sec.*, 343 Fed. Appx. 26, 32 (6th Cir. 2009) (court rejected argument that ALJ improperly relied on state agency physicians' opinions that were out of date or did not take into account changes in medical condition, noting that the decision was clear that the ALJ considered evidence after the date of the state agency physicians' opinion).

For the reasons discussed herein, the Court finds that Hinds has not shown that the ALJ erred at Step Three or in his evaluation of the medical opinion evidence. Nor has he shown that the decision is not supported by substantial evidence. Thus, even if Hinds could demonstrate that substantial evidence or indeed a preponderance of the evidence supports his position that his impairment or combination of impairments satisfies Listing 11.13, the Court cannot overturn the Commissioner's decision. *See Jones*, 336 F.3d at 477.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated: August 5, 2019

/s/ Kathleen B. Burke
Kathleen B. Burke
United States Magistrate Judge